**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **TRACY BRANNON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-169-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Tracy Brannon ("Brannon"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Brannon appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that she was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Background

Brannon was 40 years old at the time of the hearing before the ALJ on February 25, 2009. (R. 21-51, 108). Brannon had worked as a dietary aide and cashier, and had worked in packaging and in fast food restaurants. (R. 24-26). She testified that she had been fired from the cashier position for mishandling cash. (R. 27). She said she had also been fired from working at a fast food restaurant because she could not deal with the pressure. (R. 27). Brannon alleged an inability to work due to emotional and psychological problems. (R. 26-27).

Brannon testified that depression and anxiety were her most severe problems. (R. 27). She described feeling as if she could not function, talk to people, or leave home. (R. 28). Brannon testified that she would experience crying spells once or twice a week that were sometimes, but not always, precipitated by stress. *Id.* Brannon testified that she experienced feelings of worthlessness, helplessness, hopelessness, fear, distrust, and had racing thoughts. (R. 30-32). The racing thoughts caused her to have trouble concentrating while reading, watching television, and in holding conversations. (R. 32-33). Brannon testified that the lack of concentration created problems with her memory. (R. 33). She also described rapid mood fluctuations from being happy to very sad. (R. 39).

Brannon described one to two week periods of depression every month where her symptoms would worsen. (R. 28-29). During those periods, Brannon testified that she usually did not eat and had difficulty sleeping even though she would take sleep aids. (R. 29). On an average night, she would get only four hours of sleep, but during her more depressed periods, she would get even less than four hours. (R. 30). Brannon also described being scared to fall asleep because she would have vivid nightmares 2-3 times per month. (R. 35-36).

Brannon indicated a history of abuse when she was younger that caused symptoms of post-traumatic stress, including mistrust, fear, anxiety, flashbacks, and trouble with relationships. (R. 33-35). She testified that she did not like to go out and be around people. (R. 34). Brannon lived by herself and constantly checked the doors and windows, would not answer the door and frequently would not answer her phone. (R. 34, 37). She described having panic attacks on a weekly basis and whenever she would leave her apartment. (R. 36). These could occur for seemingly no reason or could be caused by leaving the apartment and fear of seeing someone from her past. (R. 36-37). During a panic attack, she felt scared, would shake, and would

usually stay in bed.  (R. 37).  Brannon also described obsessive-compulsive behavior, including the checking of her doors and windows, excess and methodical washing of dishes, frequent hand-washing, and obsessive counting.  (R. 37-38).

Brannon testified that she had a history of drug and alcohol abuse, with methamphetamine being her "drug of choice."  (R. 39-40).  She testified that she last used methamphetamine in 2006 and last drank alcohol on New Year's Eve, which she considered a "slip."  (R. 40).

Regarding her physical problems, Brannon testified that she had a bulged disc, degenerative back disease, a dislocated right shoulder, and some problems with her foot.  (R. 40-41).  She described difficulty lifting with her right arm as a result of her shoulder problems and estimated she could lift no more than 20 pounds.  (R. 41).  Brannon testified that overexertion, which she described as an hour of sustained activity, like cleaning, caused back pain.  (R. 41-42).  Her back problems also affected her ability to sit, stand, and walk.  (R. 42).  Brannon estimated that she could stand or walk for about 20-30 minutes before needing to rest and that she could sit for about 45 minutes at a time.  (R. 42-43).  Brannon also described something being wrong with her big toe, which bothered her when she walked.  (R. 43).

Brannon testified that she was receiving mental health services, including anti-depressant medication, from Family & Children's Services.  (R. 31, 43).  She also testified that she had been unable to seek treatment for her back or shoulder problems since 2005 because she did not have insurance.  (R. 42).

Brannon was seen by Jack H. Brown, M.D. from 2003 through 2005.  (R. 170-86).  On June 26, 2003, Brannon reported muscle spasms and continuous lower back and neck pain that was significantly interfering with her daily life.  (R. 182-83, 185).  The pain was made worse by

strenuous activity, but taking prescription pain medication relieved it. (R. 182). Brannon also reported feeling tense, fearful, nervous, constantly worried, and had trouble sleeping. (R. 184). Dr. Brown's examination revealed abnormal deep tendon reflexes and abnormal straight leg raises, but a normal gait, strength, and heel-toe walking. (R. 185). An x-ray indicated joint narrowing of the lumbar spine. (R. 185-86). Dr. Brown ultimately diagnosed Brannon with low back pain, fatigue, and anxiety. (R. 185). Brannon was prescribed Lortab,[1] Xanax,[2] and Soma.[3] *Id*.

Brannon saw Dr. Brown for a follow-up appointment and to refill her medications on August 26, 2003. (R. 181). Brannon reported her back pain was unchanged and continued to report stress and insomnia. *Id*. Spinal examination again revealed abnormal deep tendon reflexes and straight leg raise. *Id*. Dr. Brown refilled Brannon's prescriptions and provided a sample of Remeron.[4] *Id*. At another follow-up appointment on November 26, 2003, Brannon continued to complain of back pain and anxiety and was crying because of the death of her father. (R. 180). Brannon also reported experiencing depression because of her childhood and indicated her sister was in prison. *Id*. In addition to the diagnoses of low back pain, anxiety, and insomnia, Dr. Brown additionally diagnosed Brannon with depression and continued the same prescribed medications. *Id*. Brannon's complaints and Dr. Brown's diagnoses and medication regime continued unchanged at a subsequent visit on January 26, 2004. (R. 179).

On April 16, 2004 Dr. Brown noted muscle spasms in Brannon's lumbar spine and a

---

[1] Lortab is prescribed to treat moderate to moderately severe pain. *www.pdr.net*.

[2] Xanax is used to treat anxiety and panic disorders. *www.pdr.net*.

[3] Soma is a skeletal muscle relaxant. *www.pdr.net*.

[4] Remeron is an antidepressant. *www.pdr.net*.

tender lower back. (R. 178). Four months later, on August 23, 2004, Dr. Brown continued to note low back tenderness. (R. 177). At that time, Brannon indicated her pain level was 3-4 on a scale of 1-10 when she took medication, but a 7-8 without medication. *Id*. She also reported her anxiety was better with medication. *Id*. However, at her next appointment on October 26, 2004, Brannon reported that her anxiety was no longer better and she started crying because of her living situation. (R. 176). She reported feelings of irritability and worthlessness. *Id*. Further notation indicated Brannon's low back was very tender and stiff and hurt to bend over. *Id*.

On December 28, 2004, Dr. Brown noted muscle spasms and pain in her lumbar spine with hip flexion. (R. 175). Dr. Brown also noted that Brannon had a flat affect and was crying at the appointment. *Id*. He further indicated he had a "long discussion" with Brannon regarding her feelings of anger and sadness and appropriate intervention. *Id*. At her next appointment on February 24, 2005, Dr. Brown indicated Brannon's anxiety was stable and that she was doing well on her medication. (R. 174). He continued to note muscle spasms and tenderness in her back, as well as limited lumbar flexion. *Id*.

At a follow-up appointment on April 25, 2005, Brannon indicated her depression and anxiety were improved even though her mother had died recently. (R. 173). Once again, Dr. Brown noted tenderness of the lumbar spine with bending and limited hip flexion. *Id*. At Brannon's last appointment of record with Dr. Brown on June 23, 2005, she reported her pain varied with her stress level. (R. 172). Dr. Brown still noted bending increased the tenderness of her lumbar spine and she had some muscle spasms. *Id*. It was further noted that Brannon was more depressed because of problems with her boyfriend and was having a lot of ups and downs and Dr. Brown noted to "recommend a counselor." *Id*. Brannon agreed to start weaning off her medications. *Id*.

On November 7, 2005, Brannon had shoulder x-rays taken at St. John Medical Center that revealed she had a probable grade one AC separation of her right shoulder. (R. 170-71).

On April 14, 2006, a treatment plan was prepared for Brannon at Family & Children's Services ("FCS"). (R. 187-198). The plan indicates Brannon experienced daily depression, anxiety the majority of the time, and had panic attacks sometimes as often as 2-3 times per day. (R. 189, 197). Brannon reported difficulty sleeping, no appetite, a loss of interest, agitation, and feeling out of control. *Id*. She also reported difficulty concentrating and with her memory, as well as fear of going out in public, and with obsessive-compulsive behaviors like hand-washing. *Id*. Brannon was diagnosed by Stephen Barton, LPC, with panic disorder with agoraphobia, and major depressive disorder, recurrent. (R. 195). Her global assessment of functioning ("GAF")[5] was listed as 50. (R. 197).

On May 8, 2006, Brannon met with Deborah Brantly, M.S., CNS, at FCS. (R. 206). Brantly indicated Brannon had a flat affect and had difficulty concentrating. *Id*. Brannon reported feeling depressed and irritable. *Id*. Brantly estimated Brannon's intelligence at 90, but indicated that Brannon reported being in special education classes for math. *Id*. Brantly diagnosed Brannon with bipolar disorder and assessed a GAF score of 58. *Id*. Brantly increased the dosage of Brannon's prescribed Zoloft[6] and noted she would assess the need for a mood stabilizer at the next appointment. *Id*. Brannon was also prescribed Restoril, a sleep aid. (R.

---

[5] The GAF score represents Axis V of a Multiaxial Assessment system. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-36 (Text Revision 4th ed. 2000) (hereafter "DSM IV"). A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

[6] Zoloft is an anti-depressant medication. *www.pdr.net*.

199).  Following her appointment with Brantly, Brannon met with a case manager, Rebecca

Snider, for assistance with food and housing.  (R. 307).  Snider indicated Brannon had a broad

affect and eurythmic mood.  *Id.*

Brannon saw Brantly again on August 2, 2006.  (R. 203).  Brannon reported that after

being more calm for awhile, her anxiety had increased due to more stressors, including ending a

relationship.  *Id.*  She also indicated that she was having trouble sleeping because she had run out

of the Restoril.  *Id.*  Brantly noted that Brannon was anxious and had a constricted affect.  *Id.*

Brannon's prescriptions were refilled.  (R. 199, 203).

On September 6, 2006, Brannon reported increased, but fluctuating, anxiety and

depression with "anything" triggering mood changes.  (R. 202).  Brantly added Lamictal[7] to

Brannon's medications.  (R. 199, 202).  At her next appointment on October 18, 2006, Brannon

reported that she had stopped taking the Lamictal because it made her feel sick and gave her

headaches.  (R. 201).  Brantly instructed her to resume the Lamictal, but to take it at bedtime.  *Id.*

The record indicates Brantly refilled Brannon's medications on December 4, 2006 and January

16, 2007, but there are no corresponding treatment notes.  (R. 199).

On April 16, 2007, at an appointment with Terri Stonehocker, M.D., Brannon reported

that she had been off all of her medication except Zoloft for several months and was feeling quite

moody.  (R. 313).  In addition to her prescription for Zoloft, Dr. Stonehocker prescribed Abilify

as a mood stabilizer and Trazadone for insomnia.  (R. 263, 313).  At a follow up appointment on

May 23, 2007, Brannon reported that she was not taking the Abilify because it made her feel

strange.  (R. 314).  Dr. Stonehocker noted Brannon had a euthymic mood and congruent affect.

---

[7] Lamictal is an anti-seizure medication, but may also be used to treat bipolar disorder to
delay the time in between occurrence of mood episodes.  *www.pdr.net*.

*Id.* Dr. Stonehocker discontinued Brannon's Zoloft and Trazadone and prescribed the anti-depressant Prozac and Vistaril for insomnia. (R. 263, 314).

On June 19, 2007, Brannon's treatment plan with FCS was updated with FCS case manager Amanda Faith. (R. 268-82). Brannon reported having 5-6 panic attacks within the last month, mood swings a few times a week, and having anxiety and depression every day. (R. 272). Brannon also reported difficulty sleeping without her medication, difficulty focusing, and having paranoid thinking a few times a month. *Id.* Brannon reported that her mood interfered with relationships, and that she isolated herself and had difficulty making and keeping friends. (R. 272-73). Brannon had been staying with her alcoholic boyfriend and his mother, but moved out the day before and was staying at the Salvation Army. (R. 272). Brannon's diagnoses continued to be listed as panic disorder with agoraphobia and major depressive disorder, recurrent. (R. 278). Her GAF score was assessed at 48. (R. 280).

On July 17, 2007, Brannon reported to Jeffrey Cates, D.O., that she was doing worse and felt more jittery, worried, and anxious, and had been having more "up and down" moods and anger. (R. 317). Brannon also reported having panic attacks 1-2 times per week. *Id.* Dr. Cates adjusted Brannon's medication by discontinuing the Prozac and adding the anti-depressant Paxil, as well as Ambien for sleep. (R. 263, 317).

On September 12, 2007, Brannon met with Tracy Loper, M.D., and reported that despite some improvement on her mood and anxiety, she had recently been tearful and had persistent anxiety and panic. (R. 319). Brannon inquired about medication for her anxiety and Dr. Loper advised her that increasing the Paxil should help those symptoms. *Id.* At her next appointment with Dr. Stonehocker on December 14, 2007, Brannon had a congruent affect and was tearful, stating she had been stressed out because the electricity had been out. (R. 326). Dr. Stonehocker

continued her current medication regime.  *Id.*

When Brannon presented to Dr. Loper on March 19, 2008, she had been out of her medication and was feeling "down."  (R. 328).  Brannon reported difficulty sleeping and feeling "antsy," which she believed was made worse by the Paxil.  *Id.*  Dr. Loper discontinued the Paxil and prescribed Cymbalta instead.  *Id.*  At a case management appointment on May 28, 2008, it was noted that Brannon presented with a sad mood and affect and on October 29, 2008, she became tearful regarding her finances.  (R. 329, 333).

On December 2, 2008, Brannon had an appointment with Maria Arquisola, M.D., and reported feeling very anxious and not sleeping well.  (R. 331).  Dr. Arquisola continued Brannon's prescription of Cymbalta and added Neurontin to help with anxiety and as a mood stabilizer.  *Id.*  On that date, another treatment plan was completed by case manager Courtney Ash.  (R. 336-41).  Brannon reported feeling anxious, which was triggered by stress and finances, and rated it a 10 on a scale from 1 to 10.  (R. 340).  Brannon also reported feeling depressed, which caused her to isolate.  *Id.*  Brannon also reported forgetfulness and difficulty with concentration, as well as paranoia and obsessive-compulsive symptoms.  (R. 340-41).  Later that month, on December 31, 2008, Brannon presented to FCS for case management and financial assistance with a nervous/tearful mood and congruent affect.  (R. 334).

After the hearing before the ALJ, on April 5, 2009, Brannon presented to SouthCrest Hospital after she injured her shoulder and back by trying to lift a friend off the floor.  (R. 353-67).  Examination revealed moderate tenderness to palpitation as well as moderate muscle spasm, but negative straight leg raises, normal strength of the lower extremities, and normal reflexes.  (R. 355).  Brannon did have a decreased range of motion in her shoulder secondary to pain.  *Id.*

X-rays of her back revealed a grade I anterolisthesis[8] of the L4 vertebra onto L5. (R. 360). The shoulder x-ray was unremarkable. (R. 361). Brannon was diagnosed with acute lumbar myofascial strain and ligamentous sprain to her left shoulder. *Id.* She was prescribed pain medications and discharged. *Id.*

On May 20, 2009, Brannon presented to St. John Medical Center for continued pain in her lower back and left shoulder from the April 5th injury. (R. 368-75). She reported sharp and aching back pain that radiated down the back of her left leg as well as numbness, tingling, and increased pain with ambulation. (R. 369). Brannon was diagnosed with upper back strain, but it is unclear how she was treated or what her discharge instructions were. (R. 370).

On June 27, 2010, Brannon was admitted to Hillcrest Medical Center after experiencing a syncope[9] episode of unknown duration. (R. 377-401). Brannon reported low back pain and left knee pain following the episode. (R. 381). X-rays of her spine once again revealed a grade 1 anterolisthesis of L4 on L5, as well as other degenerative disc disease and osteoarthritis in the lower lumbar spine. (R. 392). Brannon was diagnosed with a syncope and lumbosacral strain and discharged in stable condition with a prescription for Lortab. (R. 383-89).

Agency consultant Dennis A. Rawlings, Ph.D., conducted a mental status examination of Brannon on May 2, 2007. (R. 210-220). Brannon complained of "depression, anxiety, flashbacks, mood swings, paranoid ideas, fatigue, ADHD, concentration problems, learning problems, memory problems, alcoholism, drug dependency, [and] anger problems. . ." (R. 211). Brannon also reported difficulty leaving home, being around crowds and people, dealing with coworkers and employers, and reported a history of child abuse and emotional abuse as an adult.

---

[8] Anterolisthesis is another term for spondylolisthesis, which is the forward displacement of one vertebra over another. *Dorland's Illustrated Medical Dictionary* 1684 (29th ed. 2000).

[9] Syncope is a medical term for fainting or loss of consciousness. *Dorland's* at 1747.

*Id.*  Dr. Rawlings noted that Brannon would leave home 2-3 times per week to run errands, go to appointments, or visit her daughter.  (R. 212).  Brannon reported feeling paranoid and having rage reactions when she thought of people hurting her.  *Id.*  Brannon reported having no friends, eating only twice/day, and sleeping poorly due to pain and nightmares.  *Id.*  Dr. Rawlings specifically noted that "[n]o malingering is suspected."  (R. 210).

Brannon described a dysfunctional childhood, with her parents divorcing when she was six years old, verbal abuse by her father, sexual abuse by her father and by a friend of the family, and harsh discipline, physical, verbal, and mental abuse by her mother.  (R. 213-14).  Brannon was in special education classes in school, repeated one grade, and quit school in the 8th grade.  (R. 213).  Brannon went to Tulsa Job Corps, but did not graduate and never obtained her GED.  *Id.*  Brannon reported that she began drinking at age six, and by age fourteen, she was drinking regularly and using drugs on a regular basis.  *Id.*  Mental illness and substance abuse were also exhibited by her parents and close relatives.  (R. 214).

In terms of employment, Brannon reported her emotional and physical problems interfered with all of her jobs, starting with her first job, and reported making frequent errors, lack of comprehension, being slow, needing extra breaks, and needing close supervision. (R. 211, 213). Brannon also reported she had lost 4-5 jobs due to her mental and physical problems.  (R. 213).

Dr. Rawlings recorded as part of the mental status exam that Brannon was oriented to person, place, and time, but did not know the day of the week or the month.  (R. 214).  Brannon's recent memory, remote memory, memory control, attention span, and fund of general information were intact.  (R. 215, 217).  On the Mini Mental Status Exam, she scored 28/30 points and Dr. Rawlings estimated her general level of intelligence was 90-110.  (R. 215-16).  On the WRAT-III

Reading Section, Brannon achieved a standard score of 92 and had a high school level of word recognition ability. (R. 216).

For thought content, Dr. Rawlings noted symptoms of obsessive compulsive disorder, panic disorder, social phobia or panic disorder, and posttraumatic stress disorder. *Id*. In evaluating Brannon's mood and affect, Dr. Rawlings noted she had a flat affect and was anxious and tired. (R. 217). Dr. Rawlings also noted Brannon's reports of mania, depression, disturbed sleep, anhedonia, low energy and lack of motivation. *Id*.

In summarizing Brannon's mental status, Dr. Rawlings noted limitations including:

tests of concentration were intact but affected by fatigue. Her calculations were intact for simple problems only. . . Her insight into problems is intact with exception of denial of alcoholism. She has been drunk ten times in the last year. Her impulse control appears intact but influenced by anxiety, paranoid ideas, mood swings and anxiety outside the home. Her social function is limited by anxiety, PTSD, mood swings, and ideas of reference. She is not able to manage her own funds due to alcohol.

(R. 217-18). Dr. Rawlings diagnosed Brannon with 1) bipolar I disorder, most recent episode mixed, without psychotic features, poorly treated; 2) panic disorder with agoraphobia; 3) obsessive-compulsive disorder; 4) posttraumatic stress disorder, moderate; 5) mathematics disorder; 6) active alcohol dependence; and 7) amphetamine abuse, fully sustained remission. (R. 218). Dr. Rawlings assessed Brannon's GAF score at 45. (R. 45).

On June 14, 2007, Hannah Swallow, Ph.D., a nonexamining agency consultant, completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment. (R. 221-38). For Listing 12.04, Dr. Swallow marked that Brannon had an affective disorder, evidenced by bipolar syndrome. (R. 221, 224). For Listing 12.06, pertaining to anxiety-related disorders, she noted recurrent and intrusive recollections of a traumatic experience, which cause marked distress, panic disorder, obsessive compulsive disorder, and

PTSD. (R. 221, 226). For Listing 12.09, she noted substance abuse. (R. 221, 229). For the "Paragraph B Criteria,"[10] Dr. Swallow assessed Brannon with mild limitations in her activities of daily living and in maintaining concentration, persistence or pace, and moderate difficulties in her social functioning. (R. 231). Dr. Swallow noted Brannon had experienced one or two episodes of decompensation. *Id.* In the "Consultant's Notes" portion of the form, Dr. Swallow reviewed Brannon's report of symptoms, her history of mental health treatment, and briefly summarized Dr. Rawlings' report. (R. 233). Dr. Swallow noted that Brannon's medications helped her symptoms of depression, but that she continued to experience financial and domestic stressors. *Id.* Dr. Swallow opined that Brannon "appears to be independently functional on a daily basis, except when her anxiety interferes with her ability to socialize." *Id.*

On the Mental Residual Functional Capacity Assessment form, Dr. Swallow found that Brannon was moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. 235). She also found that Brannon was moderately limited in her ability to work in coordination with or in proximity to others without being distracted by them. *Id.* Dr. Swallow found that Brannon was markedly limited in her ability to interact appropriately with the general public. (R. 236). In her narrative comments, Dr. Swallow opined that Brannon was able to understand, remember, and carry out non-complex work instructions, could make simple work related decisions, and could be expected to adapt to most routine changes in the workplace. (R. 237). She found Brannon would be able to interact appropriately with supervisors and

_____

[10] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

coworkers, but not with the general public.  *Id*.

Agency consultant Angelo Dalessandro, D.O., conducted an examination of Brannon on July 6, 2007.  (R. 241-54).  Brannon reported that depression was her primary complaint, but she also complained of low back pain.  (R. 241-42).  Dr. Dalessandro noted that Brannon had a flat affect, chronic fatigue, difficulty sleeping, and did appear to be depressed.  (R. 242).  Physical examination revealed lumbodorsal tenderness bilaterally and tenderness in the left anterior shoulder joint.  (R. 242, 244).  Dr. Dalessandro noted normal gait, straight leg raises, heel-toe walking, strength, reflexes, and normal range of motion, with the exception of 70/90 flexion and 20/25 extension of the lumbosacral spine.  (R. 242, 244-45).  Dr. Dalessandro also noted adequate grip strength and dexterity of gross and fine manipulation.  (R. 243, 247).  Dr. Dalessandro concluded that Brannon had chronic low back strain, chronic left shoulder strain, and depressive reaction.  (R. 243).

Nonexamining consultant Thurma Fiegel, M.D., completed a  Physical Residual Functional Capacity Assessment form on July 13, 2007.  (R. 255-62).  In determining Brannon's exertional limitations, Dr. Fiegel indicated that Brannon could lift and carry 50 pounds occasionally and 25 pounds frequently.  (R. 256).  Dr. Fiegel marked that Brannon could stand, walk, or sit for 6 hours in an 8-hour workday.  *Id*.  In assessing Brannon's postural limitations, Dr. Fiegel marked that Brannon could only occasionally stoop.  (R. 257).  Dr. Fiegel found that Brannon had full use of her hands and had no manipulative limitations.  (R. 256, 258).  In the narrative explanation, Dr. Fiegel noted that Brannon had a right AC shoulder separation but full range of motion of the shoulders, degenerative disc disease of the lumbar spine but with 70 degrees flexion, normal gate, and had no nerve root compression.  (R. 256).

Nonexamining agency consultant Ron Smallwood, Ph.D., completed a Psychiatric

Review Technique form on January 10, 2008.  (R. 291-303).  He marked that there was insufficient evidence to assess Brannon's medical disposition because she had missed two consultive examinations.  (R. 291, 303).

After the hearing before the ALJ, agency consultant Minor W. Gordon, Ph.D., conducted a psychological evaluation on April 10, 2009.  (R. 345-51).  Brannon reported problems with depression, anxiety, bipolar disorder, mood swings, and difficulty being around people.  (R. 345).  Dr. Gordon administered the Wechsler Memory Scale - III, which revealed mild impairment on her visual immediate memory and visual delayed memory, borderline impairment on her immediate and working memory, but the remaining scores falling into the average range.  (R. 346-47).  Dr. Gordon noted that the scores "do not represent significant memory impairment and certainly should not preclude Ms. Brannon from being able to follow oral one and two step instructions."  (R. 347).  Dr. Gordon also administered the Beck Depression Inventory and the Beck Anxiety Inventory, which revealed a moderate to severe level of depression and a severe level of anxiety.  *Id*.

The Minnesota Multiphasic Personality Inventory revealed Brannon likely had "erratic and unpredictable" behavior with "marked problems with impulse control."  *Id*.  It was also noted that Brannon was inclined to be angry, irritable, resentful, immature, insecure, and had impaired empathy.  *Id*.  Dr. Gordon noted Brannon "lack[ed] basic social skills and social withdrawal and isolation have become her means of gaining any type of comfort. . . [She] sees the world as a very threatening and rejecting place and her response is to withdraw or to strike out in anger as a defense."  *Id*.  In conclusion, Dr. Gordon opined that Brannon "could be expected to perform some type of routine repetitive task on a regular basis.  She would be able to relate adequately with co-workers and supervisors on a superficial level for work purposes.  She would have

difficulty interacting with the general public." (R. 348). Dr. Gordon also indicated Brannon may encounter "difficulty passing judgment in a work situation depending on the complexity of the task." (R. 346). Dr. Gordon diagnosed Brannon with moderate depression and anxiety, and with Cluster B personality traits.[11] (R. 348). Dr. Gordon assessed Brannon's GAF score at 65. *Id.*

Dr. Gordon also completed a Medical Source Statement concerning Brannon's mental ability to do work-related activities. (R. 349-51). Dr. Gordon noted that Brannon had marked, or serious, impairment in her ability to understand, remember, and carry out complex instructions, and in her ability to make judgments on complex work-related decisions. (R. 349). Dr. Gordon also noted that Brannon had moderate restrictions in interacting appropriately with the public. (R. 350). Dr. Brannon also marked that Brannon had mild restrictions in interacting appropriately with co-workers and supervisors, and in responding appropriately to usual work situations and in responding to changes in a routine work setting. *Id.*

## Procedural History

On January 30, 2007, Brannon filed applications for disability insurance benefits and for supplemental security income under Titles II and XVI, 42 U.S.C. §§ 401 *et seq.* (R. 21, 108-118). Brannon alleged the onset of her disability began July 1, 2003. (R. 108). The applications were denied initially and on reconsideration. (R. 54-57, 58-66). A hearing before ALJ Debra L. Rose was held February 25, 2009 in Tulsa, Oklahoma. (R.19-51). At the hearing, Brannon amended the onset of her disability to January 30, 2007. (R. 23). By decision dated June 3, 2009, the ALJ found that Brannon was not disabled. (R. 10-18). On January 20, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ

---

[11] Cluster B "includes the Antisocial, Borderline, Histrionic, and Narcissistic Personality Disorders. Individuals with these disorders often appear dramatic, emotional, or erratic." DSM IV at 685.

represents the Commissioner's final decision for purposes of further appeal.  20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[12]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

---

[12] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Brannon met the insured status requirements through September 30, 2003. (R. 12). At Step One, the ALJ found that Brannon had not engaged in any substantial gainful activity since her amended alleged onset date of January 30, 2007. *Id.* At Step Two, the ALJ found that Brannon had severe impairments of degenerative disk disease of the lumbar spine, right shoulder AC separation, depression and anxiety. *Id.* At Step Three, the ALJ found that Brannon's impairments, or combination of impairments, did not meet a Listing. (R. 12-14).

After reviewing the record, the ALJ determined Brannon had the RFC to perform less than the full range of medium work, with limitations of being able to lift/carry 50 pounds occasionally or 25 pounds frequently, occasional stooping, and with nonexertional limitations of being limited to simple routine tasks and to only occasional interaction with the public. (R. 14). At Step Four, the ALJ found that Brannon was capable of performing her past relevant work as a packer. (R. 17). Therefore, the ALJ found that Brannon was not disabled from January 30, 2007

through the date of her decision.  *Id.*

**Review**

Brannon alleges the ALJ made multiple errors in her Step Four determination, erred in failing to properly weigh and consider the medical opinion evidence, and erred in assessing Brannon's credibility.  Because the Court agrees with Brannon's argument that the ALJ erred at Step Four, her other arguments are not addressed.

Brannon argued that the ALJ failed to make a proper inquiry regarding the demands of her past relevant work and failed to follow the required steps explained in *Winfrey v. Chater*, 92 F.3d 1017, 1023, 1025 (10th Cir. 1996).  In *Winfrey*, the Tenth Circuit outlined three phases of a Step Four finding.  First, the ALJ has to make specific RFC findings, both physical and mental, and relate those findings to the evidence.  *Id*. at 1023-24.  Second, "the ALJ must make findings regarding the physical and mental demands of the claimant's past relevant work."  *Id*. at 1024. The Tenth Circuit noted that special care must be taken in cases with mental impairments.  *Id*. At phase three, the ALJ makes findings about the claimant's ability to meet the demands of her past relevant work.  *Id*. at 1024-25.

Here, the medical evidence discussed by the ALJ was exclusively that which was provided by the agency's consulting examiners, both in relationship to her Step Two and Step Three findings, and in relationship to her RFC determination.  (R. 12-17).  She reviewed the consultative examining reports of Dr. Rawlings, Dr. Dalessandro, and Dr. Gordon, and found that the opinions of Dr. Dalessandro and Dr. Gordon should be given "great weight."  *Id*.  She did not mention or cite to the reports and opinions of the two nonexamining agency consultants, Dr. Swallow and Dr. Fiegel, nor did she mention or cite to *any* evidence from *any* of Brannon's treating sources, much of which was favorable to Brannon.  *Id*.  The undersigned finds that the

ALJ's discussion of the medical evidence and the discussion of how medical opinions were weighed are insufficient and contrary to law. 20 C.F.R. § 416.927(d) ("Regardless of its source, we will evaluate every medical opinion we receive."); *Shubargo v. Barnhart,* 161 Fed. Appx. 748, 753-54 (10th Cir. 2005) (unpublished) (nonexamining consultant opinion evidence must be considered and discussed); *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (generally, the opinion of a treating physician is given more weight than that of an examining consultant); *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) ("in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects"). The undersigned finds that the ALJ's decision is not in compliance with the first phase of the Step Four finding as the Tenth Circuit outlined that phase in *Winfrey*. 92 F.3d at 1023-24.

Nor did the ALJ's decision comply with the requirement of the second phase set forth in *Winfrey*, that the ALJ make findings regarding the physical and mental requirements of the claimant's past work. Here, the ALJ glossed over this requirement and omitted any discussion of what the mental requirements of the work were:

> [Brannon] is capable of performing past relevant work as a packer. This work does not require the performance of work-related activities precluded by the claimant's [RFC]. . . In comparing the claimant's [RFC] with the physical and mental demands of this work, I find that the claimant is able to perform it as it is actually and generally performed.

(R. 17). As in *Winfrey*, the ALJ "made no inquiry into, or any finding specifying, the mental demands of plaintiff's past relevant work, either as plaintiff actually performed the work or as it is customarily performed in the national economy." 92 F.3d at 1024.

Because the ALJ failed to complete the second phase of Step Four appropriately, she was unable to accurately determine Brannon's ability to meet the demands of her past relevant work

despite her mental impairments.  *Id.* at 1024-25.  It is impermissible for the ALJ to delegate to the VE the responsibility of determining that a claimant is capable of mentally performing past relevant work.  *Id*. at 1025.  In the present case, the ALJ's Step Four conclusion was made by the VE in his testimony, which was a one sentence answer that Brannon "would be able to do the work as a packer," with no discussion of what the mental demands of that job were.  (R. 46).  This is exactly the situation that the Tenth Circuit found unacceptable in *Winfrey*:

> When, as here, the ALJ makes findings only about the claimant's limitations, and the remainder of the step four assessment takes place in the VE's head, we are left with nothing to review.

*Winfrey*, 92 F.3d at 1025.  The Court is sympathetic to the Commissioner's concern, as stated in his brief, that *Winfrey* was not intended by the Tenth Circuit "to needlessly constrain ALJs by setting up numerous procedural hurdles that block the ultimate goal of determining disability." *Westbrook v. Massanari*, 26 Fed. Appx. 897, 903 (10th Cir. 2002)  (unpublished).  However, in *Westbrook*, there was specific inquiry at the hearing regarding the demands of the past relevant work as well as a description of the work by the claimant.  26 Fed. Appx. at 903.  The ALJ in that case had also specifically found that the claimant had no mental limitations in her ability to perform semi-skilled work.  *Id*.  In the present case, the ALJ simply did not develop the record regarding the mental demands of Brannon's past work and did not make specific findings on the record at each phase of the Step Four analysis and this Court is therefore unable to conduct a meaningful judicial review.  *Winfrey*, 92 F.3d at 1025.

The undersigned emphasizes that "[n]o particular result" is dictated on remand.  *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003) (*citing Huston v. Bowen*, 838 F.2d 1125, 1132

(10th Cir. 1988)).

Because the error of the ALJ related to the *Winfrey* requirements at Step Four requires reversal, the undersigned does not address the other contentions raised by Brannon. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Brannon.

### Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 31st day of August 2012.

Paul J. Cleary
United States Magistrate Judge